J. W. McLean et al. v. W. H. Letchford et al.

1. Fraudulent Conveyance. *Setting aside for creditors. Reimbursement to grantee. Chancery pleading and practice.*
   Whether upon the setting aside, in a suit in chancery by creditors, of a fraudulent conveyance of the debtor's property, the grantee, without filing a cross-bill would be entitled, in *any state of case*, upon his mere answer, to reimbursement for money paid out in relieving the property of encumbrances, *Quære.*

1. Same. *Setting aside thereof. No reimbursement for purchase-money.*
   Where a man, in pursuance of a scheme to defraud unsecured creditors, purchases the debtor's lands under a deed of trust, and, afterwards, the creditors have the fraudulent conveyance set aside, the grantee therein is not entitled to reimbursement for the money paid out in his purchase at the sale under the deed of trust, notwithstanding the deed of trust was a valid encumbrance upon the land.

3. Same. *Setting aside thereof. Encumbrances removed. Source of payment. Reimbursement.*

Where the grantee of land purchased in fraud of the rights of creditors, buys up outstanding encumbrances on the property, in pursuance of the fraudulent scheme, he is not entitled to reimbursement, after the original conveyance to him has been set aside at the suit of the creditors, for the money expended in lifting the encumbrances from the land, if he fails to show that the money thus expended was his own means and not the proceeds of the land itself. Whether, in such case, he would be entitled to reimbursement if he did show that the encumbrances were removed with his own means, *Quære.*

4. Chancery Practice. *Interrogatories to parties. Reasonable time. Sect. 1943, Code 1880.*

Sect. 1943 of the Code of 1880 in relation to the Chancery Court, is in these words: "If the testimony of a party to the suit who resides out of the State is desired, interrogatories to him may be filed in the clerk's office, and a copy thereof with notice of filing shall be given to the party or his solicitor, and if he fails to answer such interrogatories within a reasonable time his bill shall be dismissed, if he is complainant; and if he is defendant, his answer may be taken off the file, and the bill be taken as confessed." Under this statute, interrogatories to the complainants in a suit, residing in different and distant States were filed and notice given to their solicitors in this State. At the hearing of the case, in less than thirty days after such notice had been given, the defendants moved to dismiss the bill because the complainants had failed to answer the interrogatories propounded to them. The court overruled the motion. *Held,* that the motion was properly overruled; the time intervening the filing of the interrogatories and giving notice and the making of the motion being insufficient.

5. Same. *Reasonable notice of interrogatories. Sect. 1943, Code 1880, construed.*

The severe consequences of a failure to answer interrogatories filed under the statute above quoted should not be visited on a party except where there has undoubtedly been ample time to comply with the requirements of the statute.

Appeal from the Chancery Court of Holmes County.

Hon. R. W. Williamson, Chancellor.

The case is stated in the opinion of the court.

*Catchings & Ingersoll,* and *J. E. Gwin,* for the appellants.

Conceding, for the purpose of argument, that the sale was fraudulent, the decree was, nevertheless, erroneous in not allowing J. W. McLean to be reimbursed the sums paid out in discharge of encumbrances and taxes, and in the erection of valuable improvements, less the rents received by him.

All the authorities agree that where the fraud is only con-
structive, the grantee upon the setting aside of the conveyance
will be reimbursed the purchase-money paid by him, without
reference to whether it was applied in satisfaction of debts of
the grantor or not, and also all sums laid out in the extin-
guishment of liens. It is said by counsel that the rule is
different in cases of actual fraud (*dôlus malus*), and that the
grantee in such cases will not be reimbursed to any extent
whatever. The authorities are almost unanimous in holding
that reimbursement will be decreed for all sums paid by the
grantor in lifting encumbrances, less rents received by him.
Some authorities allow reimbursement where the purchase-
money went in satisfaction of mere general creditors. See
*King* v. *Wilcox*, 11 Paige, 595 ; *Kaupe* v. *Bridge*, 2 Robt.
462 ; *Bennett* v. *Dennison*, 5 Johns. Ch. 41 ; *Scanton* v.
*Bender*, 3 How. Pr. 186 ; *How* v. *Camp*, Walker (Mich.)
429 ; *Toole* v. *Hoit*, 14 N. H. 61 ; *Mead* v. *Combs*, 19 N. J.
Eq. 114 ; *Lamb* v. *Stone*, 11 Pick. 532 ; *Hastings* v. *Spencer*,
1 Curt. 504 ; *Thomas* v. *Goodwin*, 12 Mass. 140 ; *Drury* v.
*Cross*, 7 Wall. 299 ; *Carey* v. *Brown*, 2 Otto, 171 ; *Clements*
v. *Moore*, 6 Wall. 299 ; *Rowe* v. *Cockrell*, 1 Bailey Eq. 136.

In all the cases we have cited, as in the case at bar, the
payments made by the grantee, which went to discharge
encumbrances upon the property conveyed, or general debts
due by the grantor, were made after the sale; and by persons
not connected with, or beneficially interested in the encum-
brances extinguished or debts paid. But we would invite the
attention of the court to a class of cases in which the mort-
gagee himself becomes the grantee of property, in considera-
tion of the surrender and cancellation of the mortgage.
Where such a conveyance is vacated, whether for actual or
constructive fraud, the mortgage is at once reinstated, and the
parties restored to the position they occupied before the con-
veyance. This course is universally adopted in this class of
cases. *Worthington* v. *Wilmot*, 59 Miss. 612 ; *Irish* v. *Clayes*,
10 Vt. 81 ; *Stedman* v. *Vickery*, 42 Me. 132. The reason

of this is, that the mortgages are free from vice, are not connected with the fraud which instigates the conveyance of the equity of redemption, and are entitled to stand upon their own merits, and until they are actually paid. It would, on the one hand, be to permit the creditors to speculate upon the mortgagee's fraud to allow them to set aside the conveyance to him, by which alone his lien was paid, and at the same time claim that this same vacated conveyance should still operate as a payment; while, on the other hand, to reinstate the lien, does justice to the mortgagee, imposes nothing upon the property which was not there prior to the conveyance, and gives to the creditors everything of which they were defrauded, and nothing more. Let us suppose, now, that the debtors in this case had conveyed the plantation in controversy, without the intervention of a trustee or a chancery court, directly to the Waltons, Lehman, Abraham & Co., T. H. & J. M. Allen & Co., and Richardson & May, in satisfaction of their mortgages.

These liens, amounting to the full value of the property, the conveyance could not have been successfully assailed. But suppose further, that the property was worth much more than the amount of these mortgages, and that actual fraud was shown in the transaction. Upon setting aside the conveyance to these creditors, under the rule as stated in all the authorities, their mortgages would be reinstated, and stand as valid encumbrances in all respects. Now, we ask, what is the difference, so far as the rights of creditors are concerned, between the case supposed, and a case where some third person buys the equity of redemption, and then pays off the encumbrances? Is he guilty of any more fraud or more moral turpitude than the mortgagee is, who fraudulently obtains a conveyance of the equity of redemption? Nor are the mortgages any more actually extinguished in one case than the other. If a third person buys the equity of redemption, and then pays off encumbrances, he is not a mere volunteer or stranger; for his title, though acquired through actual fraud,

is not void, but only voidable, at the instance of creditors. He, therefore, pays the mortgages because of his title to the property. But if this title is set aside, his payment of the mortgages must also be set aside, for it would be iniquitous to hold that he had no title to the property, and at the same time to hold that mortgages discharged by him, because he supposed he had a title, should stand as though finally extinguished. When his title is taken from him, mortgages paid by him must stand revived, or he must be reimbursed what he paid in satisfaction of them.

It is again submitted that the same rule must apply, because the same equity exists, where a third person buys the equity of redemption, and then discharges encumbrances, and where a mortgagee fraudulently acquires the equity of redemption in satisfaction of his mortgage, and afterwards loses the property. In both cases the creditors take the property subject to the mortgages. " Courts of equity do not affect to consider fraud in the light of crime, for it is not their province to punish, nor have they any censorial authority. They interfere in cases of fraud in a civil, and not in a criminal, point of view." Kerr on Fraud, 43.

It is a universal rule that he who seeks equity must do equity, and it is equally applicable in all cases where relief is sought in equity against damage and injury from fraud. In granting relief the court proceeds on the ground that the transaction ought never to have taken place, so that the rights of the parties are, as far as possible, to be placed in the same situation in which they would have stood if there had never been any such transaction. Kerr on Fraud, 336.

Thus far we have considered this case upon the theory that J. W. McLean was guilty of actual fraud. We now say that if there was any fraud at all it was merely constructive fraud. Under the decisions in *Fulton* v. *Woodman*, 54 Miss. 158, and *Grant* v. *Loyd*, 12 Smed. & M. 191, no fraud can be predicated of the sale of the land, because it sold for a fair and full price, and the agreement under which it was sold (if one ex-

isted), was not necessarily fraudulent. If any fraud was done it was in the reception, by J. W. McLean, of certain of the assets of G. A. McLean & Co., supposing, of course, that it had been shown that he received such assets. But inasmuch as he was a creditor himself to the amount of $3,000, and did not receive assets to a greater amount, it follows that all of the property of the debtors, both real and personal, has gone into the hands of their creditors, and that by nothing done, or agreed to be done by him, has one dollar of their assets been unlawfully diverted. It is but just to suppose that if J. W. McLean did stipulate for these assets to be placed in his hands, it was with the idea that by reason of being a creditor, he was entitled to them. Certainly, no actual intent to perpetrate a fraud can be deduced from conduct which did not, and could not, in the nature of things, result in fraud.

We now ask the attention of the court to a third class of decisions, which rest upon middle ground, and of which *Boyd* v. *Dunlap*, 1 Johns. Ch. 481, is the leading. They hold that if actual fraud be not clearly and satisfactorily made out, but the circumstances are nevertheless so suspicious that the deed ought not to stand, the courts will not take so decisive a step as to set aside *in toto* the assumed title, but will set it aside upon reimbursement to the grantee of the sum actually due him, or expended by him for the benefit of the property. *Dunn* v. *Chambers*, 4 Barb. 381; *Alley* v. *Connell*, 3 Head, 579.

We respectfully submit, that upon the principle announced in the above cases, J. W. McLean is entitled to be reimbursed, even if we are wrong in our contention that a fraudulent grantee will be indemnified for encumbrances extinguished by him, for the reason that in the worst view which can be taken of the case, it can only be said that the circumstances are suspicious. We say, moreover, that if J. W. McLean did use the assets of G. A. McLean & Co., with the understanding that when he was repaid what he had expended the property should be divided among the six brothers, the

complainants have no right to subject the whole property to their debts, but can only have a lien fastened upon it for their benefit, for the value of the assets of their debtors, shown to have been invested in it.

Interrogatories were filed under sect. 1943 of the Code, and served on complainants by mailing copies to them and handing copies to their counsel.    The purpose was to show that there was a combination between complainants (especially the original non-resident complainants) and J. N. McLean, Jr., by which J. N., Jr., directly or indirectly, was to receive a pecuniary benefit if this suit resulted favorably to them. Many of the non-resident complainants failed or refused to answer the interrogatories, and as to them defendants moved to dismiss the cause.    The court overruled the motion, holding that a commission should have issued to take their answers, as in the case of depositions.    If this view be correct, sect. 1943 would be meaningless, because defendants could, without and independent of that statute, have taken the deposition of any party to the suit, and notwithstanding that section, defendants could have taken the depositions of the complainants in the ordinary way.    The statute was designed to afford a summary and expeditious means by which a party to a suit could obtain the testimony of his adversary.    But the statute contemplates no commission.    It makes it the duty of the parties to whom the interrogatories are propounded to answer them. They must prepare their answers, swear to them, and file them with the clerk.    We insist that the course pursued by defendants was in accordance with the statute, and that the chancellor erred in overruling this motion.

*J. E. Gwin*, argued the case orally.

*Nugent & McWillie*, on the same side, filed an elaborate brief, discussing the evidence and deducing conclusions of fact therefrom.

*W. L. Nugent*, of counsel for the appellants, made an oral argument.

*Calhoon & Green*, and *Hooker & Wilson*, for the appellees.

We assume that the court is satisfied of the existence of a conspiracy by which J. W. McLean was to use the assets of the firm of G. A. McLean & Co., the annual crops of the plantations, and the mules, stock, etc., to pay off certain valid encumbrances, eking out the fund so derived with money of his own, and that he was to look for reimbursement to the products of the farms ; that he was to obtain title through a fraudulent sale under the encumbrances and hold in secret trust for the family. Our position is, that if any one of the following propositions be correct, actual fraud being shown, the decree cannot be reversed, while appellants must show that all of them are unsound before they can overthrow our case here : —

1. A purchaser in actual fraud is not entitled to reimbursement for expenditures of his own funds in paying off valid encumbrances, even where such payment was not part of the fraudulent agreement. If driven from this, which we think cannot happen, we fall back on another, viz.,

2. A purchaser in actual fraud is not entitled to reimbursement for expenditures of his own funds in paying off valid encumbrances where it was part of the fraudulent agreement that he should so pay. If wrong in this, we say —

3. A purchaser in actual fraud is not entitled to reimbursement of his own funds in paying off valid encumbrances, where it was not only part of the fraudulent agreement that he should so pay, but also that he should hold the property until its usufruct yielded him compensation. If mistaken in this, we say —

4. A purchaser in actual fraud is not entitled to reimbursement for expenditures of his own funds in paying off valid encumbrances where it was part of the fraudulent contract that he should pay them, in part, and where he did accordingly, pay them in part, out of the assets of the debtor turned over to him for that purpose, mixing funds. If this is also unsound, then we say

5. A purchaser, in actual fraud, who has simply denied fraud and lost on that issue below, cannot expect this court, after his failure in that experiment, to volunteer relief to him and order an account to determine the amount of his expenditures for reimbursement, when he has not asked it in his answer. Our last proposition is :

6. Where the facts show, as in this case, full reimbursement out of the assets of the debtor, and the income of the property fraudulently conveyed, an order for an accounting would be idle and useless and will not be made.

It is the Statute of Frauds which is to be construed in this case,— that section of it which denounces covinous conveyances as " clearly and utterly void " as to third persons. We think no decision can be found in the books which antagonizes our first position, when the mind of the court is held to the construction of that statute as the business in hand. It is only when their attention is attracted from the plain terms of the statute to a consideration of the hardship to the fraudulent grantor, that a few of the courts have stepped from the solid highway of logic into the Serbonian bogs of loose sentiment.

The decisions arrange themselves in classes. All concur in allowing reimbursement where there is constructive fraud only. Nearly all concur in refusing it where the payments were previously agreed upon as a means of effecting the fraud. It is doubtful if any case can be found to dissent from this on a fair view of the facts. All the well considered opinions give full effect to the Statute of Frauds, and deny indemnity or reimbursement for any purpose whatever when there is fraud in intent. Some allow it for payments made, after the fraudulent title vested, to lift valid encumbrances and not made in pursuance of the original scheme of fraud, thus giving partial effect to the statute. A middle class allows it where the proof of actual fraud is doubtful, assimilating this to constructive fraud. This class can furnish no reason, does furnish none, and has none to furnish. Another class allows it where the attacking creditor demands an account of rents and profits and a

personal decree, or claims the value of the property fraudulently conveyed, and demands a decree *in personam* against the fraudulent grantee, as trustee by operation of law for his use. A very small class refuse all remedy to the attacking creditor for the amount of the proceeds of the property, where it has been sold by the fraudulent grantee, thus confining the scope of the execution of the Statute of Frauds to the *corpus* of the property. All the cases protect the fraudulent grantee in any rights he had to the *corpus* of the property before, independent of, and disconnected from, the fraud.

If the fraudulent scheme was that Jesse, in order to defeat and defraud the unsecured creditors, should obtain title, through the trustees, in deeds given to secure valid debts, and he did so obtain title, it is " clearly " void and can stand for nothing, so far as we are concerned. As to us, he got nothing by his title, though it is good' as against his vendors. He paid his money to get their title, and he got it. But the creditors protest, after they have caught him, against being compelled to pay him back what he paid in the effort to cheat them. If the McLeans had owned the property, unencumbered, and conveyed it to him in fraud, a Mississippi court would hardly allow him reimbursement as against other creditors, although the vendors may have applied the money in discharge of other debts, though one or two cases in other States go to this length. Well, it is not possible to draw a distinction which will constitute a difference. A deed, fraudulent in design, is born dead and cannot stand as security for anything. Subrogation cannot be invoked, except in virtue of something done because of the conveyance, and, to that extent, it must depend on the conveyance which is attacked. Here the conveyance attacked is that from the trustees. If it falls, all its ragged habiliments fall with the corpse.

The averment that Jesse paid his own money to relieve the estate of valid encumbrances, and which were in' the way of appellees, and that to repay him would leave them in no worse condition than they were in before, is the magnet used by ap-

pellants to draw the attention of the court from the statute. In the first place, we deny the fact that he did so pay his own money without reimbursement. In the next place, we say if he did, he did it in the effort to defraud us, and that the law denies him any indemnity.·

In support of our views, we cite *Sands* v. *Cadwise*, 4 Johns. 356; *Bean* v. *Smith*, 2 Mason, 252; 2 Tucker's Com. 443; *Thompson* v. *Bickford*, 19 Minn. 17; *Davis* v. *Leopold*, 87 N. Y. 620; *Railroad Co.* v. *Soutter*, 13 Wall. 523; *Stovall* v. *Bank of Memphis*, 8 Smed.· & M. 305; *Thompson* v. *Van Vechten*, 27 N. Y. 577; *Garland* v. *Rives*, 4 Rand. 307; *Boyd* v. *Dunlap*, 1 Johns. Ch. 480; *Poague* v. *Boyce*, 6 J. J. Marsh. 84; *Jones* v. *Read*, 1 Humph. 345; *Williamson* v. *Goodwin*, 9 Gratt. 506; *Parker* v. *Holmes*, 2 Hill, 95; *Miller* v. *Tollison*, Harp. Eq. 119; *Bowie* v. *Free*, 3 Rich. Eq. 403;·*Dickinson* v. *Way*, 3 Rich. Eq. 412; 1 Ired. 340; *Weden* v. *Hawes*, 10 Conn. 54; *Crowninshield* v. *Kittridge*, 7 Metc. 523; *Bank* v. *Wheaton*, 8 Me. 373; *Short* v. *Tinsley*, 1 Metc. (Ky.) 404; *Bryant* v. *Young*, 21 Ala. 272; *Moore* v. *Tarleton*, 3 Ala. 444; *Banks* v. *Knight*, 27 Ala. 336; *Smith* v. *Corkwright*, 28 Minn. 27; *McMeekin* v. *Edmonds*, 1 Hill, 292; *Brown* v. *McDonald*, 1 Hill, 306; *Borland* v. *Walker*, 7 Ala. 269; *Halbert* v. *Grant*, 4 B. Mon. 581; *Faulke* v. *McFarlane*, 1 Watts & S. 298; *McCorkey* v. *Graff*, 23 Pa. St. 321; *Bleakley's Appeal*, 66 Pa. St. 187; *Henderson* v. *Hunton*, 26 Gratt. 926; *Ticknor* v. *Wiswall*, 9 Ala. 305·; *Holt* v: *Alamer*, 34 N. J. Eq. 187;· 1 Curt. 347; 2 Watts, 67; *Montgomery* v. *McGuire*, 59 Miss. 196; 40 Mo. 233; Bump on Fr. Conv. 594; 3 Washb. on Real Prop. 296; 38 Barb. 309; 14 Johns. 493; 19 How. 115; Rob. on Conv. 547; 44 Iowa, 379; 7 Bush, 59; 2 Har. & G. 193; 2 Hill, 56; 4 Rich. Eq. 197; 2 Pick. 136; 34 Miss. 88; 13 Col. 168; 23 Col. 236; 3 Watts, 230; 3 Head, 578; 1 Curt. 504.

If it was part of the fraudulent arrangement that Jesse should pay off the trust debts for their use, it must be held as if his·brothers and his father had paid them, and they

surely would not be reimbursed. It was done by him, if done at all with any part of his own means, as a mere accommodation to them. Practically, it was a loan to them, and he must rest for repayment upon the insecure foundation of the fidelity of his co-conspirators in the fraud.

The motion in the record to dismiss as to those complainants, who failed to answer the interrogatories filed in the clerk's office pursuant to Code, sect. 1943, was properly overruled, because : —

1. It plainly appears there was not reasonable time.

2. There appears no bill of exceptions, and *non constat*, but the chancellor took proof and was satisfied there was not reasonable time.

3. The notice of the fact and the object of the filing is insufficient.

4. The copy of the interrogatories was mailed, with no time to be crossed by attorneys, or to allow of preparation by them of advice or consultation.

5. The section is part of the general plan of obtaining testimony, and the interrogatories should have gone under a commission.

*S. S. Calhoon*, and *H. S. Hooker*, of counsel for the appellees, argued the case orally.


CHALMERS, J., delivered the opinion of the court.

On the 30th of May, 1878, J. N. McLean, Sr., and his two sons, G. A. McLean and J. N. McLean, Jr., said two sons being merchants and partners, under the firm name of G. A. McLean & Co., were the owners of three plantations on the Tallahatchie River, known respectively as Wildwood, Golddust, and Glenboro. These plantations, with the personal property situate upon them, were worth about forty thousand dollars, but were resting under mortgages amounting to two-thirds or three-fourths of their value. On the day above named a sale of the entire property took place under the junior encumbrance, the same being a trust-deed with power of sale,

owned and held by Richardson & May, of New Orleans, for $10,150. At this sale the property was bought by Jesse W. McLean, a third son of J. N. McLean, Sr., for the amount due on the trust-deed, he paying the sum of $2,500 in cash, and executing his notes for the residue, payable during the ensuing winter. The notes were met as they fell due by shipments of the cotton growing on the land at the time of sale. The trust-deed was extinguished and marked satisfied on the records of the county. Within the next three years Jesse bought in and had transferred to himself the other mortgages resting on the property. At the time of the sale the mortgageors were indebted many thousands of dollars to sundry persons, whose debts were wholly unsecured.

The holders of these debts have filed the bill in this case attacking the conveyance under which Jesse holds the property, as being in fraud of their rights and void as to them. They charge that the sale at which Jesse bought was brought about and took place at an unusual time of the year, that it was quietly and furtively conducted in order that Jesse alone might become a bidder, that in its inception and all its subsequent history, it was a fraudulent scheme, devised and carried through for the benefit of the McLean family, its primary object being to invest the title to the property in Jesse, who alone of the family was unembarrassed, in order that he might hold it, first for his own reimbursement and then for the benefit of the family generally, and that the cardinal end sought to be attained was to hinder, embarrass, and defraud them in the collection of their just demands.

The answer denies all the material allegations of the bill, asserts the entire *bona fides* of the purchase by Jesse, and denies that he holds the property under any trust, express or implied, for any other person.

Upon the issues thus joined an enormous mass of evidence was taken, much of it circumstantial, but much of it also direct, positive, and to the last degree conflicting and irreconcilable. The chancellor found the issues of fact in favor of the com-

plainants ; declared the sale to Jesse fraudulent and denied him any reimbursement for the money expended in the acquisition of the property, or for its improvement, or in the purchase and transfer of the outstanding mortgages.

A careful and laborious examination of the evidence has conducted us to the same conclusion upon the facts. It is impossible to resist the belief that the conveyance to Jesse was contrived and brought about by his brother, J. N. McLean, Jr., for the purpose of keeping the property in the family by defrauding the unsecured creditors of his father and of G. A. McLean & Co. ; and that Jesse, with full knowledge of the end to be attained, lent himself and the little money that he had, amounting at most to four or five thousand dollars, to the carrying out of his brother's scheme. That Jesse did this with some reluctance, influenced more by the desire to aid his family and save a home for his aged and infirm father, than with any intent to better his own fortunes, may soften his offence in the eyes of the world and in the forum of the moralist, but cannot change his attitude in the judgment of the law. We can know him only as a fraudulent grantee in fact, and in that attitude must determine his rights. Those rights stand upon a wholly different and far more precarious footing than if he was free from any imputation of intentional wrong, and was deemed a fraudulent grantee only because of some legal relations between himself and another, or if his act was only constructively fraudulent by reason of some rule of law. He has filed no cross-bill in the case, and perhaps on that ground alone we might decline to consider his claim to reimbursement ; but as in several cases in our reports reimbursement has been decreed without a cross-bill, in favor of grantees, where there had been constructive fraud, or where there had been actual fraud only upon the part of the grantor, we will, without deciding that such practice is admissible in the case of a grantee privy to or guilty of actual *mala fides*, proceed to examine his claim to reimbursement.

Manifestly he can recover nothing that he paid on the Rich-

ardson & May mortgage. That was the vehicle of his fraud-
ulently obtained possession. It was that which made the fraud
possible. The money paid on it was the price which the fraud
cost him. To allow him the money back would be to repay
him that which he expended in accomplishing the very thing
which the law prohibits and condemns. If it was wrong in him
to obtain the title and the possession for a fraudulent purpose,
it must be wrong to repay him the price paid therefor. He can
base no right upon the fact that his payment extinguished a
paramount lien which was superior to the rights of the com-
plainants, because the mortgage was distinguished in and by
the fraudulent acquisition of the property, and to revive it for
his benefit would be both to contravene his own act and to
cause a repayment of money expended in the act and for the
purpose of perpetrating the fraud. Bump on Fr. Conv.
(2d ed.) 594, and authorities cited.

It is furthermore admitted that the trust-deed was paid off,
except as to the cash payment, by the shipments of cotton grow-
ing on the land at the time of the sale — certainly there can be
no right of reimbursement as to this. It was, indeed, an ad-
ditional act of fraud against the creditors of the mortgageors
to apply the crops to the payment of what had become his in-
dividual debt.

With regard to the other mortgages subsequently bought
up by and transferred to him, we think that the burden of
showing that they were purchased with his own means and not
from the proceeds of the property, was upon him. If he had
demonstrated this fact it would have presented for our deci-
sion a question upon which the authorities are by no means
uniform, it being shown, that it was a part of the original
scheme that he should pay off or buy up the outstanding en-
cumbrances. The question has been exhaustively and ably
discussed by counsel, and the authorities bearing on it will be
found in their printed briefs. We have not found it necessary
to decide the point, for the reason that we are impressed with
the belief that not a dollar of defendant's money, except the

cash payment on the Richardson & May trust-deed, and sundry sums advanced in making the crops, which it is shown were returned to him out of the crops, ever was expended upon the property or in the purchase of the subsequent encumbrances. If we are in error in this, it is because the defendant, with every opportunity and inducement to do so, has failed to point out clearly and satisfactorily any other expenditures from his own means. All besides the cash payment seems to us to have been derived either from the revenue of the property, or from the assets of G. A. McLean & Co., which were fraudulently diverted from the creditors of the concern, for the purpose of aiding Jesse in cultivating the plantations, and relieving the encumbrances resting upon them. We know of no principle or authority which would justify reimbursement of such sums, nor sanction the enforcement of mortgages thus acquired.

Many of the complainants are non-residents. Interrogatories addressed to them were filed in the clerk's office, and notice thereof given to their attorneys, as authorized by sect. 1943 of the Code of 1880. Upon their failure to answer, a motion was made to dismiss the cause as to them, in accordance with the provisions of the statute. This motion was properly overruled by the chancellor, not because no commission to take their depositions had been applied for, as is suggested by counsel, since the issuance of a commission is not contemplated by the statute, but because sufficient time did not intervene between the filing of the interrogatories and the making of the motion. The complainants were residents of many different and distant States, and less than thirty days elapsed between the notice given their attorneys and the final hearing of the cause. The severe consequences of a failure to answer interrogatories under this statute should not be visited on complainants, except where there has undoubtedly been ample time to comply with its requirements.

Affirmed.